The STEPHENS SECURITY BANK, Plaintiff,

v.

The EPPIVIC CORPORATION, Defendant.

No. ED–75–79–C.

United States District Court, W. D. Arkansas, El Dorado Division.

March 23, 1976.

---

Joseph K. Mahony, II, Mahony & Yocum, El Dorado, Ark., for defendant.

C. Joseph Giroir, Jr., Rose, Nash, Williamson, Carroll, Clay & Giroir, Little Rock, Ark., for plaintiff.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

The plaintiff, The Stephens Security Bank, filed its complaint herein on November 24, 1975, in which it is alleged that plaintiff is a state banking association, organized and existing under the laws of the State of Arkansas, with its principal banking office and place of business at Stephens, Arkansas. It is further alleged that plaintiff's deposits are insured by the Federal Deposit Insurance Corporation. Defendant is alleged to be a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Dallas, Texas.

Plaintiff seeks judgment from defendant, The Eppivic Corporation, based upon a promissory note allegedly executed and delivered to plaintiff by defendant in El Dorado, Arkansas on November 14, 1975, whereby defendant borrowed and agreed to repay the sum of $25,150, together with interest thereon at the rate of eleven percent (11%) per annum, on demand, or within 180 days.

Plaintiff states that, as an inducement to plaintiff to make the loan, defendant represented by letter that the proceeds would be used for purposes of business and that, after the note was executed and defendant had obtained the cash proceeds, defendant then delivered to plaintiff a written renunciation of its obligations under the note, contending that the note is void by reason of violation of the usury laws of the State of Arkansas.

Plaintiff contends that the note is not usurious, in that the rate of interest included is specifically authorized by Section 2[24a] of the Federal Deposit Insurance Act, as amended (12 U.S.C. § 1833a).

Defendant answered, admitting that it had executed and delivered the note in question to plaintiff at El Dorado, Arkansas, that it had made the representation that the proceeds would be used for business purposes, that it had received the cash proceeds of the note from plaintiff, and that it had thereafter renounced in writing any obligations under the note. As an affirmative defense, defendant contends that the validity of the note is to be determined by the laws of the State of Arkansas, that under that law the note is usurious and void as to both principal and interest, and that Section 2[24a] of the Federal Deposit Insurance Act, as amended, (12 U.S.C. § 1833a) is violative of the Constitution of the State of Arkansas and the Constitution of the United States.

Defendant further filed a counterclaim wherein it seeks a declaration that the validity of the note is governed by the laws of the State of Arkansas, that the note is usurious and void as to both principal and interest under those laws, and that defendant, therefore, owes no obligation to plaintiff by virtue of said note.

The parties have filed pre-trial briefs and have submitted the cause to the Court for decision, without the intercession of a jury or further trial or hearing, on the basis of the pleadings and the briefs submitted.

The Court finds that there is a complete diversity of citizenship, that the amount in controversy exceeds $10,000, exclusive of costs and interest, that there exists a genuine controversy between the parties, and that this Court has jurisdiction of the parties and of this cause of action pursuant to 28 U.S.C. § 1332. Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. § 2201 et seq.

The facts are undisputed, the factual allegations of the complaint being admitted by the answer and the statement of the case and the statement of facts as contained in the brief of plaintiff being concurred with and adopted by defendant in its brief. There being no dispute as to the facts, the Court will, as requested, decide this matter without further hearing, on the basis of the pleadings and briefs.

Plaintiff is a state-chartered, FDIC-insured banking association, organized and existing by virtue of the laws of the State of Arkansas and having its principal place of business at Stephens, Arkansas. Defendant is a corporation organized and existing by virtue of the laws of the State of Texas and having its principal offices and place of business at Dallas, Texas.

Defendant made application for a loan to plaintiff at plaintiff's banking house in Stephens, Arkansas. As an inducement to plaintiff to make the loan, defendant stated in writing that the loan was for business purposes. Defendant then, through an authorized officer, made, executed and delivered to plaintiff a promissory note dated November 14, 1975, which note was executed and delivered at El Dorado, Arkansas. The proceeds of the note in the form of a cashier's check in the amount of $25,150 were then delivered to defendant.

The promissory note, in the face amount of $25,150, together with interest thereon at the rate of eleven percent (11%) per annum, was due and payable on demand or, in the absence of demand, within 180 days.

Defendant then, after receiving the proceeds of the note, gave written notice to plaintiff that it would not pay the note when due, contending that it is usurious and void as to principal and interest under the laws of the State of Arkansas.

Title II of P.L. 93–501, October 29, 1974, known and hereafter referred to as the "Brock Bill", amended the National Bank Act, the Federal Deposit Insurance Act and the National Housing Act to permit national banks, FDIC-insured state banks and FSLIC-insured savings

and loan associations to charge interest on business and agricultural loans in the amount of $25,000 or more, notwithstanding any State constitution or statute, at a rate of not more than 5 percent in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve district where the institution is located. Home mortgage, consumer and other interest rate ceilings established by any state would not be disturbed. U.S.Code Cong. & Admin. News, 93rd Congress, 2nd Session, pp. 6195–6202, referred to hereafter as "legislative history".

The Brock Bill, § 202, amended 12 U.S.C. § 1831a(a) to read as follows:

"In order to prevent discrimination against State-chartered insured banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank would be permitted to charge in the absence of this subsection, a State bank may in the case of business or agricultural loans in the amount of $25,000 or more, notwithstanding any State constitution or statute, which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill or exchange, or other evidence of debt, interest at a rate of not more than 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run."

The note in issue provides for 11 percent true interest. It is agreed by the parties that the applicable Federal Reserve bank discount rate for commercial paper, in effect at the time and within the district where plaintiff bank is located, was 6 percent, which, under the terms of the statute just quoted, would permit the plaintiff bank to charge interest at the rate of 11 percent. The statute expressly preempts any State constitution or statute setting a lower interest ceiling. The note in issue would, therefore, clearly be valid and not usurious, according to the terms of the Federal statute.

Section 13, Article 19, Constitution of Arkansas, provides that all contracts for a greater rate of interest than ten percent shall be void as to both principal and interest. Ark.Stat.Ann. § 68–602 provides that parties may agree to contract interest not to exceed ten percent per annum. Ark.Stat.Ann. § 68–603 provides that no person or corporation shall, directly or indirectly, take or receive any sum or value for the loan of money to exceed that rate. Ark.Stat.Ann. § 68–608 provides that all instruments, agreements or securities providing for a greater rate shall be void.

This provision of the Arkansas constitution, and the implementing legislation thereunder, reflect a strong public policy of the State of Arkansas, as exemplified by the various decisions of the Supreme Court of Arkansas. In Act 203 of 1951, the Arkansas Installment Loan Law, an attempt was made to permit illegal interest to be exacted under the guise of a service charge. The Court held the statute to be unconstitutional for such purposes. *Strickler v. State Auto Finance Co.,* 220 Ark. 565, 249 S.W.2d 307.

In *Hare v. General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W.2d 973, the Court overruled earlier decisions which had sanctioned an artificial distinction between a cash sale and a credit sale.

The rigorous sanctions provided for, voiding of usurious agreements as to principal and interest, and freeing of collateral from any security interest, have been stringently enforced. See *Pellerin Laundry Machinery Sales Co., Inc. v. Reed,* 300 F.2d 305 (8th Cir. 1962); *Sloan v. Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W.2d 802.

That this remains the strong public policy of the State of Arkansas is shown by the resounding defeats accorded to every attempt to modify or amend the constitutional provision, even a recent

proposal to exclude only business loans to corporations of a high dollar amount, similar to the "Brock Bill". Mitchell, Usury in Arkansas, 26 Ark.L.Rev. 263 (1972).

Under the cited provisions of the law of the State of Arkansas, there is no question but that the note involved, reserving interest at a rate greater than 10 percent per annum, is usurious. Therefore, should state law apply, the note would be void as to both principal and interest.

█ There is, therefore, a direct conflict between the Constitution and Statutes of the State of Arkansas and an Act of the Congress of the United States, the resolution of which is necessary to determine the issues raised in this case. Because the question presented is, at most, one of a conflict grounded in the Supremacy Clause of the Constitution of the United States, a three-judge court is not required. *Swift & Company v. Wickham*, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed. 194; *United Missouri Bank of Kansas City v. Danforth*, 394 F.Supp. 774 (W.D.Mo.1975). The laws of the State of Arkansas will not be affected, except to the limited extent that they may be preempted by the Act in question.

The legislative history of the Brock Bill, supra, reveals that the part of the Act involved herein will have a significant effect in only three states, each having a ten percent ceiling on business loans, being Arkansas, Tennessee and Montana. The Act permits national banks, FDIC-insured state banks, and FSLIC-insured savings and loan associations to make loans for business or agricultural purposes, in excess of $25,000, in expressed preemption of the laws of the three states.

The legislative history reflects findings that the financial community in the affected states has suffered because of the high price it must pay for money as opposed to the limitation on the interest it may earn. It was found that they must pay up to 13 percent for money bought through the Federal Reserve, while the interest they may charge is limited to 10 percent. It was also found that tax exempt municipal bonds would then yield 7.7 percent and Federal obligations would yield up to 14 percent, in competition both for depositor's funds and the available capital of the lenders.

Testimony indicated that the usury ceilings were impacting heavily on the construction, small business and agricultural areas of the economies of the states, with a likelihood of severe shortage or unavailability of credit to these classes in the economy. The report states, ". . . the evidence before the Committee indicates that . . . Unless remedial action is taken in the very near future, these states could suffer from unemployment and business failures."

These are not local problems. It was found that there were substantial effects on interstate commerce by reason of outflow from the states of capital, unemployment and consequent direct and indirect effects on the Treasury through benefits to the unemployed, and a reduction in interstate trade and agricultural production. The opponents took the position that the legislation is an encroachment on the states' prerogative of setting usury rates (p. 6196). "Although the Committee concluded that evidence before it justified Federal action of an emergency nature as envisioned here, it is concerned that this action not be construed as reflecting a Federal policy of overriding state law in this area, especially with respect to consumer and home mortgage loans. The Committee notes that the authors have characterized this as emergency legislation with a termination date of July 1, 1977. To reflect further a congressional policy of permitting a state the primary opportunity to determine its usury statutes, the Committee has amended the bill to allow a state, after passage of this Act, to override this Federal legislation by taking appropriate action at the state level to reassert or restate any state usury provision that might have been altered

or affected by passage of this Title." (p. 6197).

■ The Court considers this review of the legislative history of the Act of considerable importance, particularly as it may shed some light on the intent of the Congress and the perception of the Congress of the necessity and basis for Federal legislation in what has traditionally been an area left to the determination of the various states. The factual determinations and stated intent of the Congress are entitled to considerable weight.

Plaintiff contends that the legislation is a valid Federal regulation under the Commerce Clause of the United States Constitution, as well as the long recognized [since *M'Culloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819)] exclusive Federal authority over the national monetary and banking system. If it is thus soundly based in the Constitution, then the Supremacy Clause will operate to require that the Federal legislation control over the law of the various states.

Plaintiff also calls our attention to the direct Federal interest in the stability and viability of state banks brought about by their deposits being insured by the Federal Deposit Insurance Corporation.

*Doherty v. United States*, 94 F.2d 495 (8th Cir. 1938), involved the constitutionality of parts of the Federal Deposit Insurance Corporation Act. The Court of Appeals there stated:

"Defendant does not directly challenge the power of Congress to create a corporation to act as a government depositary and financial agent, and that power must manifestly be conceded . . . He, however, contends that Congress is without power to enact this law providing for the guarantee of deposits because in so doing it is exercising a police power which is not vested in Congress, but reserved to the states. But as Congress had the right to create this corporation and make it a depositary of public moneys of the United States and a financial agent of the government, it must be conceded

the power to enact such regulatory legislation as it deemed necessary to protect and make effective this government agency. This contention overlooks the rule that where a certain field of activity becomes subject to one of the enumerated federal powers, then the federal government may in that field exercise authority comparable to state police power. *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; *Seven Cases v. United States*, 239 U.S. 510, 36 S.Ct. 190, 192, 60 L.Ed. 411, L.R.A. 1916D, 164. As said by the Supreme Court in *Seven Cases v. United States*, supra, 'Congress is not to be denied the exercise of its constitutional authority over interstate commerce, and its power to adopt not only means necessary but convenient to its exercise, because these means may have the quality of police regulations.'"

The Court of Appeals then went on to hold that Congress may employ state banks as instrumentalities of the United States, and may pass such legislation as is necessary or convenient to accomplish its goals under the Commerce Clause. The Court also found that Congress' determination that the inclusion in the Federal Reserve System and the FDIC system of state-chartered banks would contribute to the legitimate purposes of the System was not open to question, and that Congress has the constitutional authority to adopt such means as it deems necessary for the protection and preservation of the System, citing *Weir v. U. S.*, 92 F.2d 634 (7th Cir. 1937); *Hiatt v. U. S.*, 4 F.2d 374 (7th Cir. 1925); *Westfall v. U. S.*, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927).

The Court of Appeals for the Eighth Circuit also, in a more recent opinion, *First National Bank in Mena v. Nowlin*, 509 F.2d 872 (8th Cir. 1975), gave effect to 12 U.S.C. §§ 85, 86, which were amended by § 201 of the Brock Bill, finding that it was within the powers of Congress to determine the interest rates which might be charged by National Banks and the penalty for usury, and

holding that any state statute in conflict therewith is preempted. The Court stated:

"The policy of competitive state-federal equality in the context of usury regulation is supported by the District Court's construction of § 85 which imposes the same interest ceiling on national banks as on the most favored lenders in the state, and thereby puts national banks on an equal footing with the most favored lenders in the state without giving them an unconscionable and destructive advantage over all state lenders . . ." p. 880.

\* \* \* \* \* \*

"*Evans* [*Evans v. National Bank*, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919)] categorically held that penalties for usury committed by a national bank are governed by the National Bank Act . . . To hold otherwise in the instant case would jeopardize the national banking system by allowing the states to set penalties for violations of federal law. That is patently contrary to the congressional policy of assuring national banks parity with state banks and most favored state lenders. Furthermore, since Congress has provided a penalty for usury, that action preempts the field and leaves no room for varying state penalties." p. 881.

■ From these authorities, the Court concludes that Congress had clear constitutional authority under the Commerce Clause to determine by legislation the rate of interest that may be charged by National banks, as it did in § 201 of the Brock Bill, amending 12 U.S.C. § 85. The Court further finds that in view of the long history of the policy of "competitive equality" between state and National banks embedded in the national banking system, *First National Bank v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), there is clear authority for Congressional action in this field. The control of Congress over the national banks is absolute. It is only by virtue of Federal legislation, 12 U.S.C. § 85, that the interest rates for national banks are set, and state law is referred to only as a measure of the amount. *Union National Bank v. Louisville, N. A. & C. R., Co.*, 163 U.S. 325, 16 S.Ct. 1039, 41 L.Ed. 177 (1896).

■ It follows that if Congress determines that the condition it creates by setting its own limitation on interest for national banks is detrimental to the Federal interest in the Federal Reserve System and the Federal Deposit Insurance Corporation, then it may take such additional action as it deems necessary and desirable to alleviate that problem, including setting the maximum interest rate that may be charged by FDIC-insured state banks.

In addition to these considerations, the Congress found that the existing state-imposed 10 percent limitations on interest, in consideration of the state of the national economy and money market, could affect interstate commerce through starvation of the local availability of business and agricultural credit, migration of available capital in those states to other, more favorable areas, and that this could result in unwarranted advantages to national corporations over local firms, business failures, reduction in agricultural production and a substantial increase in unemployment. All of these conditions would affect the national economy, and involve interstate commerce.

In the related cases of *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) and *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) the Court gave meticulous attention to the power of Congress under the Commerce Clause.

"In short, the determinative test of the exercise of the power by the Congress under the Commerce Clause is simply whether the activity sought to be regulated is 'commerce which concerns more States than one' and has a real and substantial relation to the na-

tional interest." 379 U.S. at p. 255, 85 S.Ct. at 356, 13 L.Ed.2d at 267.

A most pertinent quotation set forth at page 258 of 379 U.S., at page 358 of 85 S.Ct. at page 269 of 13 L.Ed.2d, from the opinion in *United States v. Women's Sportswear Mfrs. Assn.*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805, 811 (1949) is to the effect that:

". . . If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

■ The state usury laws having been found by the Congress to be applying a squeeze upon business and agricultural credit to the extent that the national economy feels the pinch upon interstate commerce, the Commerce Clause is a sound foundation for the curative legislation devised by the Congress. The findings of the Congress are clearly supported by the considerations and testimony reflected in the legislative history of the Brock Bill. It is not incumbent on this Court to attempt to substitute its judgment for that of Congress as to the effect of the situation that it perceived upon interstate commerce. *Stafford v. Wallace*, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922).

■ The Court, therefore, concludes that the interest ceiling set by the Brock Bill is applicable to the note in issue, that the note is not usurious, and that plaintiff should have judgment thereon against defendant in the amount of $25,-150.00, together with interest thereon from November 14, 1975 until paid at the rate of 11 percent per annum, together with the costs of this action. The counterclaim of the defendant will be dismissed.

Findings of fact and conclusions of law are incorporated herein pursuant to Rule 52, Federal Rules of Civil Procedure. Judgment will be entered accordingly.